948 F.2d 1290
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Jessie Edward CLEEK, Defendant-Appellee.
 No. 91-5415.
 United States Court of Appeals, Sixth Circuit.
 Nov. 21, 1991.
 
 Before RALPH B. GUY, Jr., Circuit Judge, WELLFORD, Senior Circuit Judge, and CHURCHILL, Senior District Judge.*
 PER CURIAM.
 
 
 1
 The defendant, Jessie Cleek, was indicted for unlawfully manufacturing marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). On November 20, 1990, a jury trial began that resulted in a mistrial when the jury was unable to reach a verdict. The court set a re-trial date of January 17, 1991.
 
 
 2
 Before the second trial could be held, the government elected to indict one of Cleek's key witnesses, Brenda Hicks, for perjury allegedly committed while testifying for the defendant in the first trial. This indictment caused Cleek to file a motion seeking dismissal of the charges against him on the basis of prosecutorial misconduct.
 
 
 3
 The district court held an evidentiary hearing on the dismissal motion and, on March 5, 1991, entered an order dismissing with prejudice the indictment against Cleek. The order was accompanied by written findings of fact and conclusions of law. Brenda Hicks went to trial on the perjury charge and was acquitted. The government appeals from the order of dismissal.
 
 
 4
 Upon a review of the record, we conclude that the findings of Judge Hull are not clearly erroneous, and we affirm.
 
 I.
 
 5
 Agents of the Tennessee Bureau of Investigation (TBI) regularly conduct aerial surveillance, looking for marijuana being grown. On July 24, 1990, TBI agents observed an area which appeared to contain growing marijuana plants. Ground surveillance confirmed that marijuana was being grown in a cornfield on property owned by defendant Cleek.
 
 
 6
 The agents secured a search warrant but did not execute it immediately. Instead, the agents continued surveillance and observed that some of the marijuana had been harvested. The agents actually entered upon the property and took photographs. They also found lying on the ground a feed sack that contained marijuana. One of the agents placed markings on the bag for future identification purposes.
 
 
 7
 On July 30, 1990, the search warrant was executed by a large group of state and federal officers. Cleek, although not present at the start of the search, arrived on the premises while the search was in progress. Cleek was questioned, but he initially denied any knowledge of the marijuana. A search of the basement of the house turned up the feed sack that an agent had marked earlier. Also found was a tobacco knife which had been used to cut marijuana. At this point in time, Cleek allegedly confessed to planting, growing, and harvesting the marijuana. Cleek denies making any such admissions.
 
 
 8
 At trial, the defendant testified and called several witnesses to corroborate his version of what occurred. Cleek's corroborated testimony indicated that, although the property was his, the cornfield in which the marijuana was found growing was planted and tended by a friend and business partner, Jim Foster. Cleek further testified that he had no occasion to be in the cornfield during the summer prior to July 29, 1990. Cleek had been out of town on vacation from July 18 to July 27, 1990. Upon his return, he was told by Foster that a tobacco patch, located on his property, was drying out and needed irrigation. The defendant agreed and began to set up an irrigation system, which required him to enter the cornfield. Defendant stated that it was at this time that he first found the marijuana growing among the cornstalks and also found the plastic sack, which was later found in his basement. Cleek indicated that upon finding the marijuana he began cutting it down. He also indicated that he called Foster and told him about the discovery of the marijuana. Foster's testimony corroborated that of the defendant. The defendant also called two witnesses with whom he had had breakfast during the early morning hours of July 30, 1990, shortly before the execution of the search warrant. Both witnesses testified that during the breakfast the defendant told them that he had found marijuana in his cornfield the night before.
 
 
 9
 Most significant to this appeal, the defendant testified at length about his questioning by agents who were executing the search warrant. Cleek testified that he was questioned eight to ten different times while the agents were on the premises, and that each time the questioning was accompanied by threats to take him to jail and hold him there without bail. The agents denied making any such threats. To support his version of what occurred, defendant called Brenda Hicks, one of his employees who was hired to work the tobacco crop. She was sitting on the porch at defendant's residence when the agents questioned the defendant. She testified that she heard the agents threatening to take the defendant to jail if he did not tell them who was responsible for growing the marijuana. She also testified that she never heard the defendant make any confession or any admission to the officers.
 
 
 10
 After both sides rested, the case was submitted to the jury, which became hopelessly deadlocked, and a mistrial was declared.
 
 II.
 
 11
 Central to the dismissal of the indictment against Cleek by the district judge was his view of the importance of the testimony of Brenda Hicks. We agree with this assessment of the significance of Hicks' testimony.
 
 
 12
 The agents testified that Cleek confessed in considerable detail to his involvement with the marijuana growing operation. If the agents were believed, the jury would have had no recourse but to find the defendant guilty even without considering the other circumstantial evidence implicating Cleek. Cleek, of course, denied making the admissions to the agents, but, without more, this would likely be viewed by a jury as totally self-serving. The jury heard the testimony of Brenda Hicks, the only third-party witness who shed any light on the dispute between the agents and Cleek as to what occurred. Therefore, the only conclusion that reasonably can be reached is that her testimony was undoubtedly the key factor in the minds of those jurors who held out for acquittal.
 
 
 13
 To place the testimony of the agents in its proper perspective, the other evidence, or lack thereof, against Cleek must also be considered. Although it is certainly superficially incriminating that marijuana was found growing on defendant's property, the defendant offered a plausible explanation as to why he did not know of its existence. The government produced no witnesses who could place the defendant in the cornfield at any time, and defendant's corroborated version of Foster planting and tending the corn crops was not rebutted in any way by the government. Furthermore, the marijuana plants were well hidden by the growing corn, so that one would have to enter the cornfield to find the marijuana plants. Cleek's testimony that he had no occasion during the summer to enter the cornfield until he had to go there to run the irrigation lines also stood unrefuted. It must be remembered in this regard that the agents involved in this investigation had this property under surveillance for several days, during which time Cleek was never observed in any conduct which would tie him to the marijuana, other than being the owner of the premises. Although we are not prepared to say that the government would not have had proof beyond a reasonable doubt without Cleek's admissions, it is safe to say that the government's case would have been severely weakened if the agents' testimony as to these admissions is disbelieved.
 
 
 14
 There is little doubt that the government also viewed Hicks' testimony in this light, as it is highly unusual for a witness to be indicted for perjury in the relatively short time span between the declaring of the mistrial and the new date set for the retrial.
 
 
 15
 The government was faced with the situation in which the retrial essentially would be a replay of the first trial. There was no reason to think that a second jury, upon hearing Brenda Hicks' testimony, would be any more likely to convict than was the first jury. In focusing on this aspect of the trial, we do not mean to suggest that the government was insincere in its belief that Brenda Hicks had committed perjury. We do note parenthetically, however, that it was unable to translate this belief into an argument that convinced the jury who heard the case against Brenda Hicks.
 
 
 16
 We have no way of knowing whether Judge Hull, who heard Brenda Hicks testify at Cleek's trial, believed her or not. It is clear, however, from his findings of fact following the evidentiary hearing on the motion to dismiss, that he credited Ms. Hicks' version of the circumstances surrounding her arrest and subsequent treatment by the police officers. Judge Hull found that there was an aura of intimidation surrounding the entire episode involving the arrest and subsequent prosecution of Ms. Hicks, starting with the fact that the officers chose to arrest her on the street shortly after she had dropped off her eight-year old son at school and repeatedly made references to the fact that she could be separated from her son for a number of years if she was found guilty on the perjury charge. Ms. Hicks was a single parent, and it is clear that her son and his welfare were paramount in her life. Judge Hull concluded that this was not merely a prosecution for what the government believed to have been false testimony given under oath but, rather, was an attempt to intimidate Ms. Hicks to the point where at the retrial of Cleek she would change her testimony and would not testify as she had done before. The agents made it clear to her that if she testified in the same manner as she had earlier she could be prosecuted again for perjury.
 
 
 17
 The trial judge heard the testimony of the involved parties and was in a far superior position to ours to judge their respective credibility. We give great deference to a trial judge's determination of credibility under circumstances such as are presented here.
 
 III.
 
 18
 The government also argues on appeal that even if we credit Judge Hull's factual findings we should nonetheless reverse for two reasons. First, dismissal is a very harsh remedy and should only be resorted to where the government's conduct was not only egregious but also resulted in demonstrable prejudice to the defendant. Second, the facts have changed since Judge Hull rendered his opinion. The subsequent acquittal of Brenda Hicks should now remove any fear she might have harbored relative to testifying just as she did in the earlier trial.
 
 
 19
 As to the government's first point, we agree that dismissal with prejudice is a harsh remedy and should be used only where it appears that no other curative measure would be appropriate. Second, we also agree that the acquittal of Brenda Hicks as a legal matter probably does insulate her from any subsequent prosecution for perjury were she to testify in a second trial as she did in the first trial. We note two things in that regard, however. First, at the time that Judge Hull decided the motion to dismiss, Brenda Hicks had not yet been acquitted. Second, Brenda Hicks has only an eighth grade education and is a simple field worker concerned primarily with earning a living to support her young son and herself. It is entirely another question whether the whole process so intimidated her as to make it impossible for her to offer Cleek the same kind of support that she offered in the first trial. Judge Hull thought this was the case, and we are not prepared to say he was wrong.
 
 
 20
 Both sides in this appeal have cited a number of cases that they feel support their positions. We have not dealt with those cases in this opinion because we find none of them to be outcome determinative. The government's cases point out, as it vigorously has argued, that dismissal with prejudice is an extreme remedy. The defendant's cases point out that, although dismissal may be an extreme remedy, the courts on a number of occasions have found dismissal appropriate. None of the cases cited are close enough to the facts in this case to provide other than the general legal backdrop against which we view what happened here.
 
 
 21
 As we have heretofore intimated, no small portion of the rationale for our affirming the trial judge is our conclusion that he was in a much better position to make a determination than we are. He presided over the entire trial of Cleek, and he was able to ascertain the strength of the prosecution's case, the significance of the individual witnesses' testimony, and the credibility of all of the persons involved. Judge Hull also held a full evidentiary hearing on the motion to dismiss, and once again made credibility determinations that are very relevant to the outcome of these proceedings.
 
 
 22
 We do not wish this decision to be read as one that would forbid the government from ever indicting a key witness for perjury after a mistrial and before the retrial. Under the facts here, we conclude that the trial judge correctly ruled that Hicks had been sufficiently traumatized such that the defendant would likely be deprived of the type of evidentiary support which was material to the jury's inability to agree on a verdict in the first trial.
 
 
 23
 AFFIRMED.
 
 
 24
 CHURCHILL, Senior District Judge, concurring.
 
 
 25
 I concur but suggest that the circumstances justifying a prosecution, or even the suggestion of a prosecution, of a defendant's witness between the defendant's first and second trial will be rare.
 
 
 
 *
 Honorable James P. Churchill, United States District Court for the Eastern District of Michigan, sitting by designation